**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ANGELA CAMPBELL,**

        **Plaintiff,**

      **vs.**

**COUNTY OF ONONDAGA and JAMESVILLE**
**CORRECTIONAL FACILITY,**

        **Defendants.**
_____

**5:04-CV-1007**
**(NAM/GHL)**

**APPEARANCES:**

Brown & Hutchinson
925 Crossroads Building
Two State Street
Rochester, New York 14614
*Attorneys for Plaintiff*

Anthony P. Rivizzigno
County Attorney
421 Montgomery Street, 10th Fl.
Syracuse, New York 13202
*Attorneys for Defendants*

**OF COUNSEL:**

Michael Cobbs, Esq.

Carol L. Rhinehart, Esq.

**Norman A. Mordue, Chief U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**INTRODUCTION**

      Plaintiff Angela Campbell, an African American female, alleges that defendants

discriminated against her based on her race and gender in violation of 42 U.S.C. § 2000e *et seq.*

("Title VII");  42 U.S.C. §§ 1981 and 1983; and the N.Y. Exec. Law § 296 ("New York State

Human Rights Law" or "NYSHRL").  Presently before the Court is defendants' motion (Dkt. No.

36) pursuant to Fed. R. Civ. P. 56(c) seeking summary judgment and dismissal of plaintiff's

complaint.

## FACTUAL BACKGROUND

The record herein contains few undisputed facts.  Plaintiff and defendants' witnesses disagree on many of the events that transpired and provide conflicting accounts of the circumstances culminating in plaintiff's termination.  In support of the motion, defendants properly filed a Statement of Material Facts pursuant to Local Rule 7.1.[1]  In response, plaintiff provided a "Rule 56 Statement of Facts in Opposition to Motion for Summary Judgment". However, plaintiff failed to specifically admit or deny defendants' factual statements as required by Local Rule 7.1.  *See Michalski v. Home Depot, Inc.*, 225 F.3d 113, 115 (2d Cir. 2000) (non-movant did not respond to statement and therefore, factual assertions were uncontested). Therefore, to the extent that defendants' statements are supported by the record, the Court will deem defendants' facts admitted by plaintiff.  *See Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009).  In opposition to the motion, plaintiff provided additional material facts and an affidavit to support those facts.  Defendants did not respond to the additional facts.  To the extent that plaintiff's affidavit does not contradict her prior deposition testimony, the Court will consider those additional facts in the context of the within motion.  *See Mack v. U.S.*, 814 F.2d 120, 124 (2d Cir. 1987).  The facts, as discussed herein, are for the relevant time period as referenced in the

---

[1] Local Rule 7.1(a)(3) states:

The opposing party shall file a response to the Statement of Material Facts.  The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs.  Each denial shall set forth a specific citation to the record where the factual issue arises.  The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute.  <u>Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party</u>.

Local Rule 7.1(a)(3)(emphasis in original).

2

complaint.

The Onondaga County Department of Corrections ("DOC") operates as a paramilitary organization.  Since April 29, 1999, Timothy Cowin has been the Commissioner of Correction, the highest-ranking official.  Commissioner Cowin has general oversight of both security and administration of Jamesville Correctional Facility ("Facility").   The Commissioner has the final authority to ultimately render decisions with respect to such personnel matters as appointments, terminations, promotions, probationary terms and disciplinary actions.  At the relevant time, Patricia Mosley was an Assistant Commissioner responsible for administrative operations and Randy Blume was an Assistant Commissioner responsible for security operations.  The employees of the Facility rank in descending order from captain, lieutenant, sergeant, senior correction officer, correction officer and correction officer trainee. Commissioner Cowin, Asst. Commissioner Mosley and Asst. Commissioner Blume provided deposition testimony with regard to this matter.  In addition, Captain Thomas Tripoli, Lieutenant Kevin McGinn and Lieutenant John Burghardt were employed by the DOC at the relevant time and provided testimony with regard to the within matter.

Plaintiff's Employment with DOC

On January 22, 1998, plaintiff successfully passed the Civil Service Exam.  On February 2, 1998, plaintiff was appointed as a Correction Officer Trainee with the DOC and attended orientation for employment with the County.  On February 1, 1999, plaintiff completed a probationary period as a Correction Officer Trainee and her job status changed from probationary to permanent Correction Officer.  In April 2001, plaintiff received a performance appraisal and was rated "good" in all areas other than attendance for which she received an "acceptable"

3

rating.[2]  Between 1998 and 2001, plaintiff did not take any civil service examinations pertaining to any positions, promotional or otherwise.  At the relevant time, plaintiff was assigned to B-Watch, Squad 6 at the Facility.

Plaintiff's Allegations of Harassment and Discrimination

Plaintiff alleges that in April 1999, Senior Correction Officer Dwight Benjamin made a racially offensive statement/joke in the presence of other officers in the staff dining room.  Plaintiff claims that Officer Benjamin asked what the acronym "n.e.o.n." meant and when no one answered, he stated, "niggers excited over nothing".  Plaintiff was not present when the joke was allegedly told and she did not personally complain to the administration about the joke.  Plaintiff claims that African American officers made a "collective" complaint.

In 2000, Senior Correction Officer Sally Brush, a white female, generated and distributed a flyer through the Facility.  The flyer was printed in black and white.  The heading of the flyer read as follows:

**FOR SALE 1 NEW BASKETBALL**

**CHEAP CHEAP CHEAP CHEAP**

Under the heading, two black figures were drawn, one with a black and white striped shirt.  Contact information was provided below the picture.  Plaintiff was offended by the flyer/poster which she described as "a hangman with a black face and black body".  Plaintiff did not complain to the administration, nor did she personally file any complaints regarding the flyer.

Plaintiff also alleges that in 1990, the Black History Awareness Committee organized

---

[2] Defendants contend that plaintiff was issued an "Oral Warning Notation" for excessive absenteeism.  The record contains a copy of that notation however, the document is not in admissible form as it has not been authenticated.

events to celebrate Black History Month. Plaintiff claims that White officers would deface flyers publicizing Black History Month and that in 1993, "African American employees" complained to the Commissioner. Plaintiff claims that as a result of the complaints, the Black History Awareness Committee was banished in 2000.[3]

Employee Appearance and Dress - Policy Directive #0015

In May 2001, the DOC circulated Policy Directive #0015 entitled Employee Appearance and Dress among officers. The directive provided, in pertinent part:

> 2.   Uniformed Female Staff
>    a.   Hair styling
>       (1)   Hair shall be neatly styled.
>       (2)   Hair ornaments, ribbons, pins, etc., shall not be worn. Conservative combs and barrettes may be used.

On May 27, 2001, plaintiff signed an acknowledgment indicating that she received, read and understood Policy Directive #0015. Commissioner Cowin testified that, "[t]he purpose of th[e] directive . . . is for the security and safety of the officer to have the hair up and away".

Correction Officer Brett Robinson's Violation of Appearance and Dress Directive

In March 1999, prior to the enactment of Directive #0015, Correction Officer Brett Robinson, a white male, was found to be in violation of a former directive with the same title regarding employee appearance and dress. On March 30, 1999, Officer Robinson was ordered to get a haircut. Officer Robinson did not comply with the order. On April 15, 1999, after Officer Robinson failed to get a hair cut, the DOC issued Officer Robinson a Counseling Memorandum. On April 22, 1999, as Officer Robinson was still in violation of the directive, the DOC issued an

---

[3] In support of these allegations, plaintiff provided an affidavit from Sgt. Anita Washington. Sgt. Washington is a plaintiff in a separate civil action entitled *Anita Washington v. County of Onondaga and Jamesville Correctional Facility* (04-CV-997).

Oral Warning Notation with further orders directing the officer to get a hair cut.  On April 29, 1999, Commissioner Cowin prepared a Notice of Charges to Correction Officer Brett Robinson disciplining Officer Robinson for violating the directive.  Commissioner Cowin suspended Officer Robinson for 30 days without pay.  Officer Robinson was not terminated as a result of violating the directive.[4]

Plaintiff's Alleged Violation of Employee Appearance and Dress Directive

On August 21, 2001, plaintiff reported to work with her hair braided into 8 braids with 2 barrel-shaped beads at the bottom of each braid (16 beads total).[5]   At the relevant time, Lt. McGinn was in charge of B-Watch and Capt. Tripoli was Lt. McGinn's supervisor.  On August 21, 2001, Capt. Tripoli had a telephone conversation with Asst. Commissioner Blume concerning the beads and it was determined that plaintiff was in violation of Directive #0015.   Capt. Tripoli informed Lt. McGinn that the beads were in violation of the directive and had to be removed. There is conflicting testimony concerning who was plaintiff's direct supervisor on August 21, 2001.  According to Lt. McGinn, plaintiff's supervisor was Sgt. Anita Washington.  However, plaintiff and Sgt. Washington claim that plaintiff's supervisor was Sgt. Christine DeFoster, a white female.[6]

Lt. McGinn directed Sgt. Washington to speak with plaintiff and order her to remove the beads.  The same day, Sgt. Washington gave plaintiff a copy of the directive and told plaintiff that

---

[4] The record does not contain any information with regard to the current status of Officer Robinson's employment with the DOC.

[5] Plaintiff claims that she appeared at work with beads in her hair on August 19, 2009 and August 20, 2009. Defendants do not directly dispute that claim, however defendants allege that plaintiffs supervisors were not aware that plaintiff had beads in her hair until August 21, 2001.  The record contains conflicting deposition testimony with regard to how plaintiff's supervisors became aware that she was wearing beads.

[6] The record does not contain any testimony or affidavit from Sgt. DeFoster.

she "was informed to give them to her".  Sgt. Washington did not tell plaintiff to remove the beads from her hair.  Plaintiff claims that at the time Sgt. Washington gave her the directive that she asked Sgt. Washington for a harassment form.  Plaintiff could not recall whether or not Sgt. Washington gave her the form.  Plaintiff testified that she "believed" she filled out a harassment form but that she "could not recall" and further, she could not remember if she submitted the form.[7]

On August 22, 2001, plaintiff returned to work with the beads in her hair.  Lt. McGinn ordered plaintiff to report to staff dining after roll call.  At some point that morning, Lt. McGinn directed Sgt. LeFebvre to discuss the situation with plaintiff.  Sgt. LeFebvre directed plaintiff to his office to address the issue with Officer Days present.[8]  Sgt. LeFebvre directed plaintiff to remove the beads.  Plaintiff told Sgt. LeFebvre that the beads had been professionally "sewn in" and had to be professionally removed.  Sgt. LeFebvre directed plaintiff to leave the Facility using her own time to resolve the hair issues.  At the sergeant's request, plaintiff completed a MAS 2026 leave form request and testified that she put her name on the form, wrote that she was told to get her hair done and signed the form.[9]  After completing the form, plaintiff left the Facility.  Capt. Tripoli testified that at the time plaintiff left, she had the next few days off.  Asst. Commissioner Blume confirmed that plaintiff's "pass days" (days off) were August 23rd and

---

[7] Plaintiff alleges that she "contacted the EOC about it".  This conclusory allegation is unsupported by the record.

[8] The record does not contain an affidavit or deposition transcript of testimony by either Sgt.LeFebvre or Officer Days. The record contains a memorandum from Sgt. LeFebvre to Lt. Conboy however, the memorandum is not authenticated and not in admissible form and will not be considered in the context of the within motion. The account of events that transpired in Sgt. LeFebvre's office is taken from plaintiff.

[9] The 2026 form is not part of the record herein. Defendants claim that Sgt. LeFebvre charged the time against vacation leave credits is unsupported by the record.

August 24th.

<u>Plaintiff's Absence from Work on August 25, 2001</u>

In support of their motion, defendants provided an affidavit from Renee Hawker, an Account Clerk Typist in the Payroll Unit of the DOC. Ms. Hawker averred that plaintiff had prior approval for a vacation day on August 25, 2001. However, there is a factual dispute concerning whether plaintiff was aware that her future leave was in jeopardy. Ms. Hawker claims that plaintiff was aware, as early as August 15, 2001, that she no longer had sufficient credits to cover her vacation days.[10] Plaintiff claims that she was never advised, at any time, that she could not take vacation that day.

There is also a factual dispute as to whether or not plaintiff was advised that she needed to report to work on Saturday, August 25, 2001. Asst. Commissioner Blume and Capt. Tripoli testified that they did not know if plaintiff was told, at the time that she left the Facility on August 22, 2001, that she was required to report to work on August 25, 2001. Plaintiff claims she was never ordered to report on August 25, 2001. Capt. Tripoli testified that Lt. Conboy telephoned plaintiff and left a message.[11] Plaintiff testified that she did not receive a telephone message from any officers or supervisors directing her to report to work on August 25, 2001.

Lt. Burghardt was scheduled to be the B-Watch Commander on duty on August 26, 2001. Lt. Burghardt testified that Capt. Tripoli telephoned his home on August 25, 2001 and directed Lt. Burghardt to bring plaintiff into his office if she reported to work on August 26, 2001. Lt. Burghardt claims that Capt. Tripoli further instructed Lt. Burghardt to direct plaintiff to write a

---

[10] Plaintiff did not respond to the assertions in Hawker's affidavit.

[11] The record does not contain any deposition testimony or affidavit from Lt. Conboy.

8

report and to have another officer present.[12]

Plaintiff's Suspension

On August 26, 2001 plaintiff reported to work without beads in her hair. Prior to roll call, Lt. Burghardt, called plaintiff into his office where Sgt. Griffin was present.[13] Lt. Burghardt instructed plaintiff to write two reports, one "dealing with the beads" and the second "dealing with being AWOL". Plaintiff prepared a report and gave her account of what transpired since August 21, 2001. The last paragraph of plaintiff's report reads as follows:

> On 26 Aug 01, when Lt. Burghardt stated I was AWOL on the 25 Aug 01 was not correct. I have an approved 2026 authorizing me the day off. I am requesting a copy of my report and a harrassment [sic] form. Thank you.

Lt. Burghardt acknowledged receipt of plaintiff's report by initializing and dating the report. Upon completion of the report, Lt. Burghardt requested plaintiff's badge and I.D. Card and escorted plaintiff from the Facility.[14] Lt. Burghardt testified that he told plaintiff to call Capt. Tripoli the next day and that plaintiff advised that she was not going to call as she was seeking legal counsel. Plaintiff testified that she was never told by Lt. Burghardt to contact Capt. Tripoli. Plaintiff never returned to the Facility.

Plaintiff did not contact Capt. Tripoli on August 27, 2001 and testified that she did not attempt to make any contact with the Facility after she left on August 26, 2001. There is a factual dispute as to whether or not DOC employees attempted to call plaintiff at her home between August 25th and August 29th. According to Asst. Commissioner Blume, Lt. Conboy called

---

[12] Capt. Tripoli did not provide any testimony concerning this call.

[13] The record does not contain any testimony/affidavit from Sgt. Griffin.

[14] Lt. Burghardt claims that he advised plaintiff that she was on "administrative leave". Plaintiff disputes that claim.

plaintiff's home twice on August 28, 2001.  Lt. Conboy allegedly left a message on plaintiff's

answering machine directing plaintiff to report to the Facility on August 29, 2001 and to

immediately contact the Facility.[15]  Asst. Commissioner Blume further testified that Capt. Tripoli

called plaintiff's home three times on August 28, 2001 and left three messages on plaintiff's

answering machine advising her to contact him or Asst. Commissioner Blume.[16]  Plaintiff did not

contact the Facility.  Plaintiff testified that she never received any telephone messages on her

answering machine directing her to report to work.

　　　On August 29, 2001, a letter of suspension was sent to plaintiff via certified mail. Asst.

Commissioner Blume testified that the letter was also hand delivered to plaintiff's house by Capt.

Tripoli.[17]  The letter was approved by Commissioner Cowin.[18]  The letter advised plaintiff that on

August 26, 2001, she was suspended with pay and ordered to contact her Security Captain no later

than August 27, 2001.  Plaintiff was further advised that due to her failure to contact her Security

Captain or respond to, "subsequent orders via telephone calls that have been made since August

28, 2001" that she was suspended without pay for "refusing to follow job instructions and for

your unauthorized absences".  The letter further directed plaintiff to immediately contact the

Security Captain and/or the Watch Commander for instructions.

---

[15] The record contains a memorandum from Lt. Conboy to Asst. Commissioner Blume regarding attempts to contact plaintiff.  However, as there is no testimony or affidavit from Lt. Conboy, the memorandum is not in admissible form and cannot be considered in the context of the within motion.

[16] The record does not support Asst. Commissioner Blume's contentions.  The record contains a memorandum from Capt. Tripoli to Asst. Commissioner Blume. However, the memorandum cannot be considered by the Court as Capt. Tripoli did not authenticate or provide any testimony concerning the memorandum.  Moreover, although Capt. Tripoli was deposed, he did not provide any testimony concerning these alleged attempts to contact plaintiff.

[17] This claim was not confirmed by Capt. Tripoli.

[18] Commissioner Cowin testified that Asst. Commissioner Mosley sent the letter to plaintiff under his signature, with his approval.

10

The letter was returned to the DOC stamped "REFUSED".  Plaintiff claims she never received the August 29, 2001 letter and testified that she never refused to receive certified mail and that no one in her home told her that they refused mail.  Plaintiff claims that she had no contact with the DOC until September 24, 2001.

Charges and Termination

On September 4, 2001, the DOC prepared charges against plaintiff.  The Notice of Charges stated, in pertinent part:

> #1 - Failure to report to work without notifying the immediate Supervisor ½ hour before and/or after starting time, depending on the need for replacement.
>
> #3 - Unauthorized absence.
>
> #12 - Neglect of job duties or responsibilities.
>
> #25 - Failure to follow job instructions, directions or departmental procedures and policies.
>
> #38 - Refusal to follow job instructions.
>
> Specification 1:
>
> On August 26, 2001, you reported for duty on B-Watch.  The B-Watch Commander had you file a report regarding your Absent Without Leave (AWOL) on August 25, 2001.
>
> Upon completing your report, you were relieved from duty and ordered to call the Security Captain on August 27, 2001, no later than 1000 hours.  You failed to contact the Security Captain by 1000 hours on August 27, as ordered, and you did not call at all on August 27.
>
> On August 28, 2001, several calls were made to your residence in an attempt to make contact with you.  Messages were left for you to contact the facility.  In addition, you were also ordered to report to the department on August 29, 2001 at 0900 hours.  You did not respond to our calls or report at 0900 hours on August 29, 2001.

11

Again, further attempts were made to contact you, without success, through 1500 hours on August 29.  At this time, a certified letter, return receipt, and a regular letter were sent through the mail to your address notifying you that you are suspended without pay for your unauthorized absences.  The letters also stated that you were ordered to contact the Security Captain and/or Watch Commander upon receipt of the letter.  As of 1200 hours on September 4, 2001, you have not communicated with us, and responded to our letters, and continue to be AWOL.  In fact, the certified letter we sent was returned to us on September 4, 2001 marked "REFUSED".

You have been continuously AWOL for more than eight days from August 27, 2001 through September 4, 2001.

Capt. Tripoli went to plaintiff's home with a copy of the charges.  Upon finding no one at the residence, Capt. Tripoli deposited the charges in plaintiff's mail slot in her door.  Although plaintiff acknowledged that she received the charges, she testified during her deposition that she could not recall when.

On September 24, 2001, Commissioner Cowin prepared a letter to plaintiff advising that as she failed to appeal the charges, she was terminated from her position as Correction Officer, effective September 24, 2001.  Plaintiff acknowledged receiving this letter.

On September 27, 2001, plaintiff sent a letter to Commissioner Cowin.  Plaintiff claimed that she received the charges on September 20, 2001 and refuted the allegations in the charges. On October 3, 2001, Commissioner Cowin sent a letter to plaintiff advising that as she was terminated, all future correspondence must be directed to the Director of Employee Relations.  On October 31, 2001, plaintiff filed a grievance of the charges.  On November 9, 2001, the DOC rejected plaintiff's grievance claiming that it was untimely.

Correction Counselor I Position

On January 12, 2002, plaintiff took a civil service examination for the position of

12

Correction Counselor I.   According to Commissioner Cowin, plaintiff scored a 75 (ranked 6th on a certified eligibility list) on the examination and pursuant to the Civil Service Law, could not be selected for the position.  Commissioner Cowin testified that an African American female who ranked third was hired for the position.[19]

April 4, 2002 Meeting Addressing Racial Concerns

On April 4, 2002, Commissioner Cowin met with two Onondaga County Legislators, Lovie Winslow and Althea Chaplin, and three African American Correction Officers, Maxine Adams, Marion Jones and Romie Days, to discuss the officers' concerns with regard to a hostile work environment.[20]  Plaintiff was not present at the meeting.  According to Commissioner Cowin, the gathering was "an informational meeting" to discuss the socialization policy and the Civil Service Law as it related to promotions.  On May 8, 2002, Officer Adams forwarded a letter to Commissioner Cowin indicating that, "[w]e discussed the issues Black officers feel are causing a stressful, hostile work environment".  Officer Adams listed the matters discussed including but not limited to: limited promotional opportunities for minorities; low minority retention through probation period and after probation; inequitable disciplinary handling when dealing with minorities; retaliation for filing complaints; limited training; minority participation in the "honor guard", "black history month program"; and inequitable shift assignments.

Plaintiff's Complaint with the State Division of Human Rights

On September 23, 2002, plaintiff filed a complaint with the New York State Division of

---

[19] Plaintiff testified that she could not recall her ranking and that she was not aware of who was ultimately placed in the position.

[20] With the exception of Commissioner Cowin, the record does not contain any testimony or affidavit from any of the individuals who attended the meeting.  The record contains a copy of Commissioner Cowin's deposition transcript in the case of *Washington v. County of Onondaga*.  The facts regarding the meeting are taken from that transcript.

Human Rights ("NYSDHR").  In the complaint, plaintiff alleged that the date of the most recent

or continuing discrimination took place on September 24, 2001.  Plaintiff charged the County of

Onondaga with unlawful acts of discrimination related to her employment due to her race and

color in violation of NYS Human Rights Law § 296.  Specifically, plaintiff's complaint contained

the following allegations:

> 1.    I am African American.  I believe that because of this I have been terminated by the respondent.
>
> 3.    On Tuesday, August 21, 2001 I was given papers by Sgt. Washington, which included the respondent's dress code policy.  Sgt. Washington said that she had been ordered to give the papers to me.  I was wearing beads in my hair on August 19 without knowing there was a policy against it.  It was well known that an [sic] Latino Corrections Officer, Aida Sands, had worn beads and ribbons in her hair while at work, and that a Senior Corrections Officer, Brett Roberts [sic], had worn his hair in a pony tail while at work.  I asked Sgt. Washington for a harassment form because I was being singled out.  The respondent's dress code policy which I was given a copy of appeared to me to be vague.
>
> 4.    On Wednesday, August 22 2001 I was called into a meeting attended by Sgt. Norman LeFebvre and Corrections Office Romie Days, who is Vice President of my union, and ordered to remove the beard [sic] from my hair.  I explained that my hair had been woven and that I could not just remove the beads.  I further explained that I would have to have someone remove the beads for me.  I told Sgt. LeFebvre that I had worn my hair with beads for my last 4 shifts prior to that day without being spoken to about it.  Sgt. LeFebvre called someone on the telephone and then informed me that he was ordered to tell me to get the beads removed from my hair.  I punched out and Sgt. LeFebvre gave me a 2026 personal leave form which he ordered me to fill out, which I did.  I was scheduled to be off on Thursday and Friday, and had been approved to be off on Saturday, August 25, 2001.  I returned to work on Sunday August 26, 2001 and was told by Lt. Burghardt that he didn't know what was going on, but he had been informed that I had refused to take the beads out of my

> hair on August 22, and was AWOL on August 25, 2001.  He
> ordered me to write a report outlining what had taken place,
> and advised me that he was taping our conversation.  I asked
> for union representation, but he said that he would get
> someone after I finished my report.  After I wrote my report,
> he took my badge and identification and I was escorted out of
> the building.

Plaintiff further alleged that on September 21, 2001, she received a certified letter from

respondent dated September 4, 2001 outlining the charges against her.  Plaintiff alleged that she

was held to a different standard by respondent and terminated because of her race and color.

After an investigation, the Division issued an Investigation Summary.[21]  In the decision,

the Division addressed Officer Robinson's suspension:

> Documentation has been provided regarding Brett Robinson, a
> Caucasian male, being disciplined by the respondent for violation of
> the dress code.  Mr. Robinson was ordered on March 30, 1999, to get
> his hair cut, but no further action was taken until April 15, 2003 [sic],
> which he was given a counseling memorandum for failing to do so.
> On April 22, 2003 [sic], Mr. Robinson still had failed to comply with
> the order to cut his hair, and was given an Oral Warning Notation.  He
> was not suspended until April 29, 1999, after he had still failed to cut
> his hair.  This contrasts sharply, both in time frames and specific
> actions taken, with the respondent's handling of the complainant's
> situation.

The Division concluded:

> It must also be noted that after the complainant was suspended, she
> failed to act with due diligence, in that she did not report to
> administration as ordered nor contact the respondent for several weeks
> after the initial suspension.  The complainant's own actions may have
> caused the disciplinary situation to escalate to termination.  However,
> this does not negate the issues of racial discrimination with which the
> disciplinary process was begun.

The Division also issued a Basis for Determination and concluded that there was probable

---

[21] The Investigation Summary is undated.

cause to believe that plaintiff was treated in a disparate manner based on her race and color.

Again, the Division addressed Officer Robinson's situation and stated:

> In contrast, a white male officer who violated the respondent's dress code was not required to leave the premises, and was permitted to continue violating the dress code for over six weeks, during which time he was given counseling and an oral warning, prior to being suspended by the respondent.

On March 21, 2005, the Division dismissed the matter for administrative convenience as plaintiff intended to pursue federal remedies in court.

### THE COMPLAINT[22]

Plaintiff alleges that, "[t]he pattern and practice of encouraging a racially hostile environment, of not promoting qualified African Americans, and discriminatory discipline and disparate treatment of African American officers has continued for many years despite complaints by [P]laintiff and other African American officers, government reports and studies and newspaper articles concerning these issues".   Plaintiff claims that these events have taken place for "at least the past 20 years".

In the first, second, third, fourth and tenth causes of action, plaintiff alleges that she was subjected to racial discrimination as defendants encouraged and permitted a racially hostile work environment at the Facility in violation of N.Y. Executive Law § 296, Title VII and 42 U.S.C. §§ 1981 and 1983.   Plaintiff claims that she was subjected to offensive and derogatory name calling and racially offensive jokes.

In the fifth, sixth, seventh and eighth causes of action, plaintiff alleges that she was subjected to harsher punishment than Caucasian officers in violation of N.Y. Executive Law §

---

[22] Plaintiff filed the complaint *pro se.*

296, Title VII, and 42 U.S.C. §§ 1981 and 1983.

The ninth cause of action alleges intentional infliction of emotion distress.  The eleventh, twelfth, thirteenth and fourteenth causes of action allege that defendants failed to promote plaintiff and other African Americans due to racial discrimination in violation of N.Y. Executive Law § 296, Title VII and 42 U.S.C. §§ 1981 and 1983.  The fifteenth cause of action alleges that defendants retaliated against plaintiff for complaining about discrimination and unjustly and discriminatorily disciplined and terminated plaintiff.   Specifically, plaintiff claims that she was terminated in retaliation for filing a racial harassment complaint when she was given the dress code policy by Sgt. Washington.[23]

## DISCUSSION

### I.    Rule 8(a)

Defendants' notice of motion seeks summary judgment pursuant to Fed. R. Civ. P. 56. However, defendants also argue that plaintiff's allegations fail to state a claim for relief and, "should be stricken".[24]

A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  *See* Fed. R. Civ. P. 8(a)(2).  Dismissal under the "lenient standard of Rule 8 . . . 'is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised.' " *Parker v. City of New York*, 2004 WL 2671634, at *2 (E.D.N.Y. 2004) (quoting *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988)) (holding that the purpose of the rule is to ensure that the adverse party has

---

[23] The Court notes that although plaintiff refers to "racial and gender discrimination" in Paragraph 3 of the complaint, plaintiff does not assert any cause of action based upon gender discrimination.

[24] Defendants do not specifically move for dismissal pursuant to Fed. R. Civ. P. 12(b)(6).

adequate notice of the claims against him to prepare effectively for trial).

In the case at hand, extensive discovery has been conducted including depositions of several witnesses and plaintiff.  Clearly, plaintiff's complaint and allegations were detailed enough to enable defendants to prepare a motion for summary judgment with a 25-page memorandum of law.  Accordingly, defendants are sufficiently aware of the relief plaintiff seeks and the nature of her claim.  *See Eteng v. New York State Dep't of Labor*, 1994 WL 642789, at *10 (S.D.N.Y. 1994) (holding that it was clear from the defendant's motion papers and the deposition of the plaintiff that the amended complaint was detailed enough to enable the defendant to prepare for trial).  Therefore, the Court finds that plaintiff has adequately complied with the requirements of Rule 8(a).

## II.   Statute of Limitations

Defendants argue that all of plaintiff's claims, with the exception of claims brought pursuant to 42 U.S.C. § 1981, are barred by the applicable statutes of limitations.

### A.   Timeliness of Plaintiff's NYSHRL and 42 U.S.C. §1983 Claims

Defendants argue that plaintiff's state law claims and her claims pursuant to 42 U.S.C. §1983 are time-barred as the claims are governed by a three-year statute of limitations. Defendants claim that the instant action was filed on August 24, 2004 and thus, defendants claim that any incidents of alleged discrimination occurring prior to August 25, 2001 are time-barred. Plaintiff argues that she filed suit on August 20, 2004, and therefore all of her claims are timely pursuant to the continuing violation theory.  To wit, plaintiff claims that defendants engaged in a "series of separate acts that collectively constitute one unlawful employment practice".

Initially, the Court notes that contrary to plaintiff's assertion, plaintiff did not file her

18

complaint on August 20, 2004.  Rather, the complaint was filed with this Court on August 25,

2004.   The federal complaint contains claims of alleged racially discriminatory acts that occurred

during the statutory period including: (1) plaintiff's "suspension" from work on August 26, 2001

when she was asked to surrender her badge and identification, escorted from the Facility and

placed on administrative leave; (2) article charges filed against plaintiff on September 4, 2001; (3)

Commissioner Cowin's letter of termination dated September 24, 2001; and (4) defendants'

failure to promote plaintiff to Correction Counselor I.  All of the aforementioned events occurred

after August 25, 2001 and are therefore, timely.

The federal complaint also contains allegations of incidents that contributed to a hostile

work environment.  Some of the events occurred within the statutory period and are therefore

timely.  These allegations include: (1) the fact that there were no African Americans on DOC

executive committees; and (2) Commissioner Cowin's refusal to address the concerns of African

American Corrections Officers.  However, plaintiff also asserts hostile work environment claims

based upon alleged acts that occurred outside the 3-year limitations period including: (1) incidents

in 1999 and 2000 involving racially offensive and derogatory name calling and comments

including the "n.e.o.n." joke and flyer; (2) occurrences in 1990 including the sabotage of black

history celebrations; and (3) the DOC's abandonment of diversity training in 1993.   Absent a

continuing violation, these allegations are barred by the statute of limitations.

The Second Circuit has applied the continuing violations doctrine to claims pursuant to §

1983.  *Richards v. City of New York*, 2007 WL 1030294, at *9 (E.D.N.Y. 2007) (citing *Cornwell*

*v. Robinson*, 23 F.3d 694, 703-04 (2d Cir.1994) (analyzing statute of limitations defense under 42

U.S.C. § 1983 in same manner as Title VII claim).  "[T]he continuing  violation doctrine is

disfavored in this Circuit, and will be applied only upon a showing of compelling circumstances."
*Petrosky v. N.Y. State Dep't of Motor Vehicles,* 72 F. Supp.2d 39, 48 (N.D.N.Y. 1999) (citations
omitted).  Under the continuing violation doctrine, a plaintiff may bring suit based on conduct
that occurred outside of the statute of limitations period, provided that the conduct is a result of
specific discriminatory policies or practices.  *Cornwell*, 23 F.3d at 704.  If a plaintiff has
experienced a " 'continuous practice and policy of discrimination, . . . the commencement of the
statute of limitations period may be delayed until the last discriminatory act in furtherance of it.' "
*Bloom v. New York City Bd. of Educ. Teachers' Ret. Sys. of City of New York*, 2003 WL 1740528,
at *7 (S.D.N.Y. 2003) (quoting *Gomes v. Avco Corp.*, 964 F.2d 1330, 1333 (2d Cir. 1992).

A hostile work environment claim challenges "repeated conduct" that "occurs over a
series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment
may not be actionable on its own".  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118
(2002).  Therefore, a hostile work environment claim is timely, and can challenge acts occurring
outside the statute of limitations period, as long as "any act that is part of the hostile work
environment" occurs within the statutory time period.  *See Shomo v. City of New York*, 2009 WL
2767032, at *3 (2d Cir. 2009) (citing *Morgan*, 536 U.S. at 118).  If an act occurred within the
statutory period,  "the entire time period of the hostile environment may be considered by a court
for the purposes of determining liability."  *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206,
220 (2d Cir. 2004) (citing *Morgan*, 536 U.S. at 117).

As noted, plaintiff's federal complaint alleges hostile acts that occurred within the
statutory period **and** allegations involving incidents that occurred well beyond the statutory
period.  As plaintiff's hostile work environment claim results from "a series of separate acts that

collectively constitute one unlawful act", the claims are continuing violations and are not time

barred.  *See Shomo*, 2009 WL 2767032, at *3.

> **B.** **Claims brought pursuant to Title VII**

Plaintiff alleges that she was subject to racial and gender discrimination in violation of

Title VII including disparate treatment (disparate discipline, failure to promote and termination),

hostile work environment and retaliatory acts.  Defendants argue that plaintiff failed to file a

timely charge with the EEOC and therefore, her Title VII claims are subject to dismissal.

Plaintiff argues that she timely filed her complaint with the New York State Division of Human

Rights ("NYSDHR") and under the work share agreement between the EEOC and the NYSDHR,

a charge filed with one agency is automatically filed with the other.

Timely filing of a charge of discrimination with the EEOC is a prerequisite to filing a Title

VII complaint in federal court.  *See* 42 U.S.C. S 2000e-5(e)(1).[25]  New York has an agency with

the authority to address charges of discriminatory employment practices, therefore the statute of

limitations for filing a charge of discrimination in New York is 300 days.  *See Butts v. City of*

*New York,* 990 F.2d 1397, 1401 (2d Cir. 1993), superceded by statute on other grounds as stated

in *Hawkins v. 1115 Legal Servs. Care*, 163 F.3d 684, 693 (2d Cir. 1998).   The 300-day

limitations period is not a jurisdictional prerequisite to suit in federal court; it is "a requirement

that, like the statute of limitations, is subject to waiver, estoppel and equitable tolling".  *Mauro v.*

*Bd. of Higher Ed.*, 658 F.Supp. 322, 323 (S.D.N.Y. 1986) (quoting *Zipes v. Trans World Airlines,*

---

[25] This section provides, in pertinent part, that a Title VII charge "shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . ., except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local [equal employment opportunity] agency . . ., such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1).

*Inc.*, 455 U.S. 385, 393 (1982)).

### 1.    Dual Filing

In New York, a charge of discrimination may be filed with either the EEOC or the New York State Division of Human Rights. *Burns v. County of Schenectady*, 2009 WL 2568546, at *5 (N.D.N.Y. 2009).   Moreover, based upon a worksharing agreement between the EEOC and the NYSDHR, charges received by the Human Rights Division are automatically deemed dual-filed with the EEOC. *See Brown v. Research Found. on of SUNY*, 2009 WL 1504745, at *6, n. 6 (N.D.N.Y. 2009) (citing *Anderson v. Nassau County Dep't of Corr.*, 2008 WL 752449, at *10 (E.D.N.Y. 2008)).   Therefore, the Court finds this portion of defendants' argument for dismissal lacks merit.

### 2.    Continuing Violation

Defendants do not specifically address the timing of plaintiff's NYSDHR complaint. However, upon a review of the record and in light of defendants general, though inartful arguments, the Court is compelled to address the issue.

Plaintiff filed her NYSDHR complaint on September 23, 2002 and stated that the "most recent or continuing discrimination" occurred on September 24, 2001.  Based upon the date of filing, only events that occurred during the 300-day period prior to filing, that is, on or after November 27, 2001 - are actionable under Title VII. *See Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 (2d Cir. 1996).  Therefore, in order to introduce evidence of incidents that occurred prior to November 27, 2001, plaintiff must establish a "continuing violation".   Plaintiff

contends that her claims of hostile work environment occurred over a series of days and years.[26]

The continuing violation doctrine applies to claims of a very limited scope. *Klein v. New York University*, 2008 WL 3843514, at *2 (S.D.N.Y. 2008). On a motion for summary judgment, the court determines whether plaintiff "produced sufficient evidence to establish that there existed a genuine issue of fact whether the defendants' acts were related closely enough to constitute a continuing violation or were merely discrete, isolated and completed acts which must be regarded as individual violations." *Purdy v. Town of Greenburgh*, 166 F.Supp.2d 850, 863 (S.D.N.Y. 2001). "[M]ultiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." *Lambert v. Genesee Hosp.*, 10 F.3d 46, 52 (2d Cir. 1993), *cert. denied,* 511 U.S. 1052 (1994); *Cornwell,* 23 F.3d at 704. Moreover, "[d]emotion, failure to promote, and termination have all been deemed discrete acts." *Pauling v. Sec'y of the Interior*, 960 F.Supp. 793, 801-02 (S.D.N.Y.1997); *see also Washington v. County of Rockland*, 373 F.3d 310, 318 (2d Cir. 2004) (holding that an employer's decision to file disciplinary charges against an employee is clearly a single act, discrete in its nature). To bring a claim within the continuing violation exception, a plaintiff must, at the very least, allege that one act of discrimination in furtherance of the ongoing policy occurred within the limitations period. *Patterson*, 375 F.3d at 220.

With regard to a Title VII claim, in order to avail herself of the continuing violation doctrine, plaintiff must allege, in the EEOC or NYSDHR complaint, that at least one act of

---

[26] Plaintiff presented no argument that the continuing violation doctrine was applicable to plaintiff's other Title VII claims of racial discrimination and retaliation. The Court further notes that in the federal complaint, plaintiff stated that she was issued a right to sue letter by the EEOC on August 19, 2004. However, the record does not contain a copy of the alleged correspondence and plaintiff makes no reference to the letter in her opposition to defendants' motion.

23

discrimination or a hostile act occurred within the limitations period.  *See Morgan*, 536 U.S. at 114; *see also Roberts v. County of Nassau*, 140 Fed.Appx. 277, 279 (2d Cir. 2005) (holding that the plaintiff failed to allege any hostile act by the defendant that took place within the 300-day filing period to state a timely continuing violation claim).  Even so, discrete acts of discrimination occurring outside the Title VII limitations period are not actionable on the theory that a different act of discrimination occurred within the limitations period.  *Morgan*, 536 U.S. at 153 (holding that termination, failure to promote, denial of transfer or refusal to hire are discrete acts as they are easy to identify and "occur when they happen").

As previously discussed, the continuing violation doctrine saves plaintiff's § 1983 claims because plaintiff's federal court complaint clearly alleged hostile acts by defendants that occurred within the statutory period.  In contrast, plaintiff's attempt to avail herself of the "continuing violation" doctrine to save her Title VII claims fails for two reasons.  First, plaintiff's NYSDHR complaint lacks any allegations of discrimination, hostile work environment or retaliation within the statutory period - 300 days of her NYSDHR complaint.  Plaintiff was terminated on September 24, 2001 and all of the allegations contained in the NYSDHR complaint relate to incidents that occurred prior to November 2001.  Even viewing all evidence in a light most favorable to plaintiff, the record lacks any evidence of any hostile or discriminatory act that could have occurred within the statutory period.  Indeed, the last contact plaintiff had with defendants was on November 9, 2001 when defendants rejected plaintiff's attempt to file a grievance.[27]

Second, even if the NYSDHR complaint contained allegations of discrimination that took

---

[27] Although plaintiff makes allegations relating to a meeting in April 2002 between Commissioner Cowin and African American officers, the NYSDHR complaint contains no allegations or references relating to that meeting.

place within the 300-day filing period, plaintiff's allegations involve unrelated, discrete acts of

disparate treatment based upon her race.  Each instance of disparate treatment, i.e. plaintiff's

August 26, 2001 suspension, plaintiff's termination and the failure to promote plaintiff are all

separate, discrete acts.  Therefore, to the extent that plaintiff's Title VII claims are premised upon

employment decisions that allegedly occurred prior to November 2001, they are time barred.  *See*

*Delena v. Verizon New York Inc*., 2007 WL 2973583, at *8 (W.D.N.Y. 2007).  Thus, the doctrine

of continuing violation is inapplicable and plaintiff's Title VII claims are untimely.

## III.      Standard for Summary Judgment

A party moving for summary judgment bears the initial burden of demonstrating that there

is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Fed. R.

Civ. P. 56; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the Court, viewing the

evidence in the light most favorable to the nonmovant, determines that the movant has satisfied

this burden, the burden then shifts to the nonmovant to adduce evidence establishing the existence

of a disputed issue of material fact requiring a trial.  *See id*.  If the nonmovant fails to carry this

burden, summary judgment is appropriate.  *See id*.

Courts have acknowledged the dangers of summary judgment in discrimination cases.

"Because direct evidence of . . . discriminatory intent will rarely be found, affidavits and

depositions must be carefully scrutinized for circumstantial proof which, if believed, would show

discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citations and

internal quotation marks omitted).  A plaintiff must, however, provide more than conclusory

allegations of discrimination to defeat a motion for summary judgment.  *Id*.

## IV.      Section 1981 and Municipal Liability

25

Section 1981 prohibits racial discrimination in the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship including in the employment setting". *Hawkins* 497 F.Supp.2d at 376 (citing *Patterson*, 375 F.3d at 224-225). Section 1981 does not impose vicarious liability on municipalities for employee decisions made in the course of their official duties. *Tekula v. Bayport-Blue Point Sch. Dist.*, 295 F.Supp.2d 224, 232 (E.D.N.Y. 2003) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 721 (1989). To assert §1981 claims against a municipality, a plaintiff must expressly assert a cause of action based upon 42 U.S.C. § 1983. *McKie v. Laguardia Cmty. Coll.*, 2008 WL 4489796, at * 3 (E.D.N.Y. 2008) (citing *Jett*, 491 U.S. at 701). Section 1983 allows an action at law against a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws". *Patterson*, 375 F.3d at 225 (citing 42 U.S.C. § 1983). To hold a municipal defendant liable, a plaintiff "must show that the violation of his § 1981 rights was caused by a custom or policy", *Jimenez v. City of New York*, 605 F.Supp.2d 485, 497 (S.D.N.Y. 2009) (quoting *Jett*, 491 U.S. at 702), or undertaken by a municipal employee with final policymaking authority. *McKie*, 2008 WL 4489796, at *4 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)). Where a plaintiff contends that the action complained of was "taken or caused by an official whose actions represent official policy, the court must determine whether that official had final policymaking authority in the particular area involved." *Pisano v. Mancone,* 2009 WL 2337131, at *5 (S.D.N.Y. 2009) (citing *Jeffes v. Barnes*, 208 F.3d at 49, 57 (2d Cir. 2000)).

26

In this case, defendants concede that, "[t]he Commissioner . . . is the individual with final authority to ultimately render decisions with respect to such personnel matters as appointments, terminations, promotions, probationary terms, disciplinary actions, etc."  As defendants do not deny that Commissioner Cowin was the final policymaker for decisions concerning employee terminations, plaintiff's § 1981 claim based upon race may move forward.  *See Pisano*, 2009 WL 2337131, at *5 (S.D.N.Y. 2009).[28]

## V.   Racial Discrimination Under Section 1981 and NYSHRL

On a motion for summary judgment, claims of discrimination under Title VII, Section 1981 and the NYSHRL are analyzed under the burden shifting analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Davis v. Avaya, Inc.*  295 Fed.Appx. 380, 381 (2d Cir. 2008).   The first step in the *McDonnell Douglas* formulation requires a plaintiff to prove, by a preponderance of the evidence, a *prima facie* case of discrimination by the employer.  *See Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 446-47 (2d Cir. 1999).  If plaintiff establishes a *prima facie* case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.  *Id.* at 446.  In the third step of the *McDonnell Douglas* process, the burden then shifts back to plaintiff to demonstrate that the proffered reason was not the true reason for the employment decision, and that race was the true reason.  *See id.*  In the complaint, plaintiff asserts racial discrimination based upon:  (1) failure to promote; (2) disparate disciplinary treatment; and (3) termination.  The Court will address these claims seriatim.

### A.   Failure to Promote[29]

---

[28] Section 1981 claims can only be brought based upon race. *See Runyon v. McCrary*, 427 U.S. 160, 170-71 (1976).   Therefore, plaintiff's claims of gender discrimination are barred.

[29] Plaintiff does not respond to or address defendants' contention that her claims should be dismissed.

To assert a *prima facie* case of discriminatory failure to promote, a plaintiff must demonstrate: "(1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications" or hired a person outside of the protected class with the same qualifications as plaintiff.  *See Petrosino v. Bell Atlantic*, 385 F.3d 210, 226 (2d Cir. 2004); *see also Brown v. County of Oneida*, 2000 WL 1499343, at *2 (N.D.N.Y. 2000).  The Second Circuit has held that a plaintiff is required to allege that she applied for a specific position(s) and was rejected therefrom. *Brown v. Coach Stores, Inc*., 163 F.3d 706, 710 (2d Cir. 1998).

In the complaint, plaintiff identified only one specific personal promotional opportunity that she claims she was denied based upon her race - the position of Correction Counselor I. However, upon a review of the record, the Court finds that plaintiff has failed to present sufficient evidence suggesting that she was not promoted to this position based upon her race.  The record contains contrary evidence which refutes the second and fourth elements of plaintiff's *prima facie* case.  Plaintiff admitted that she did not take any civil service examinations during her employment with the DOC.  Indeed, plaintiff did not take the civil service examination for the position of Correction Counselor I until January 2002, approximately 3 months after she was terminated.  Plaintiff presented no evidence with regard to her ranking or who was ultimately selected for the position.  According to Commissioner Cowin, plaintiff ranked 6th on the certified eligibility list which prevented her from being selected for the position.  Further, Commissioner Cowin stated that an African American female was ultimately hired for the position.  Plaintiff has presented no evidence to refute Commissioner Cowin's assertions.  *See Lee v. Healthfirst, Inc*.,

28

2007 WL 634445, at *11 (S.D.N.Y. 2007) (holding that the plaintiff's conclusory opinion that she was more qualified and/or experienced than the personal ultimately selected was insufficient to establish a *prima facie* case).  Thus, plaintiff has failed to make a threshold showing that she was denied promotional opportunities giving rise to an inference of discrimination.

### B.    Disparate Disciplinary Treatment

Plaintiff argues that she received harsher discipline for her alleged violation of the Employee Appearance and Dress Directive than other similarly situated employees.  Plaintiff identifies the individuals as Officer Aida Sands, Officer Patty Correga, Officer Sally Hirsch, Officer Brush, Senior Officer Constantino and Officer Brett Robinson.[30]

In applying the *McDonnell Douglas* test, a plaintiff alleging discrimination based on disparate disciplinary treatment must demonstrate that she was subject to an adverse employment action "and that a similarly situated employee not in the relevant protected group received better treatment." *Carter v. New Venture Gear, Inc.*, 310 Fed. Appx. 454, 457 (2d Cir. 2009) (quoting *McGuinness*, 263 F.3d at 53).  For disparate treatment to be probative of discrimination, a plaintiff must first demonstrate she was "similarly situated in all material respects to the individuals with whom she seeks to compare herself".  *Walker v. New York City Dep't of Corr.*, 2008 WL 4974425, at *13 (S.D.N.Y. 2008) (quoting *Shumway v. UPS*, 118 F.3d 60, 64 (2d Cir.1997)).  In determining whether persons are "similarly situated in all material respects" the Second Circuit has advised courts to consider: (1) whether the plaintiff and those she maintains were similarly situated were subject to the same workplace standards; and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness. *Walker,* 2008

---

[30] The record does not contain any deposition testimony or affidavits from any of the officers.

WL 4974425, at *14 (citing *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000)).  "[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Ganzy v. Sun Chemical Corp.*, 2008 WL 3286262, at *6 (E.D.N.Y. 2008) (quoting *Graham*, 230 F.3d at 39) (holding that in a claim of disparate treatment based on inconsistent disciplinary practices, a plaintiff is required "to show that similarly situated employees who went undisciplined engaged in comparable conduct").  The mere fact that a plaintiff believes that white employees similarly situated were not disciplined for similar professional failures is not a sufficient basis to infer discrimination.  *Dean v. Westchester County Dist. Attorney's Office*, 119 F.Supp.2d 424, 430 (S.D.N.Y. 2000).

Based upon lack of evidence in the record, the Court is constrained to examine plaintiff's allegations that she was "similarly situated" to Officers Sands, Correga, Hirsch, Brush and Constantino.  Plaintiff does not identify these individuals or their job duties with any specificity. *See Moore v. New York State Div. of Parole*, 2008 WL 4394677, at *13 (E.D.N.Y. 2008) (holding that by failing to identify the race and sex of employees in a comparison group, the plaintiff failed to meet her burden of establishing a *prima facie* case).  Plaintiff also failed to submit any evidence concerning the circumstances under which the aforementioned officers allegedly violated the directive, or any evidence concerning the alleged less severe disciplinary actions taken against these officers.  Plaintiff's own affidavit contains merely conclusory allegations that these officers engaged in the same conduct without similar consequences.  *See Burniche v. Gen. Elec. Automation Servs., Inc.*, 306 F.Supp.2d 233, 240 (N.D.N.Y. 2004) (in support of the

argument that male employees engaged in the same conduct and were not terminated, the plaintiff cited to no affidavit or deposition transcript other than her own).

The Court reaches a different conclusion with respect to plaintiff's allegations relating to Officer Brett Robinson. The record contains evidence which suggests that plaintiff and Officer Robinson were similarly situated and engaged in conduct of comparable seriousness which resulted in inconsistent disciplinary practices. Officer Robinson, a white male, was employed by the DOC in the same capacity as plaintiff. Officer Robinson allegedly violated the directive and was ordered to get his hair cut. Officer Robinson initially received a counseling memorandum and oral warning notation. One month after he was initially ordered to get a haircut, Officer Robinson was suspended without pay for 30 days. In contrast, on August 22, 2001, plaintiff was ordered to leave the Facility after being notified on August 21, 2001 that she was in violation of the directive. Moreover, plaintiff complied with the order to remove the beads and upon returning to the Facility on August 26, 2001, plaintiff was directed to write a report "dealing with the beads". The Court notes that the NYSDHR also observed that Officer Robinson's situation, "contrasts sharply in both time frames and specific actions taken" in comparison to plaintiff. Based upon the record, the Court finds that plaintiff sufficiently identified a similarly situated individual, who engaged in an act of "comparable seriousness," but was punished less severely than plaintiff based on an application of disciplinary rules or a code of conduct. *See Graham*, 230 F.3d at 40. Therefore, the Court finds that plaintiff has established a *prima facie* case of discrimination based upon alleged disparate disciplinary treatment between she and Officer Robinson.

C.     **Termination**

Plaintiff claims that the discriminatory manner in which defendants started disciplinary proceedings against plaintiff due to her violation of the directive caused her termination.  Plaintiff believes that she was terminated because of her race.

To establish an inference of discrimination, plaintiff must submit evidence tending to show preferential treatment given to employees outside the protected class, or, more generally, upon the timing or sequence of events leading to the plaintiff's termination.  *Id.* (internal citations omitted) (citing *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir.1996)).  Evidence that a termination occurred under "debatable circumstances" is sufficient to meet the *de minimis* burden of establishing a *prima facie* case.  *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994).  On a motion for summary judgment, the Court must determine whether the proffered admissible evidence shows circumstances which would be sufficient to permit a rational finder of fact to infer a discriminatory motive.  *Chambers*, 43 F.3d at 38.

### 1.    Preferential Treatment of Employees Outside Protected Class

Plaintiff alleges that "two other employees" of the DOC were absent without leave but were not terminated.  However, the Court cannot credit this allegation in light of plaintiffs failure to provide any information regarding these individuals, including their names.  Plaintiff explains that her inability to offer detailed evidence is due to defendants refusal to produce the personnel files of these fellow Corrections Officers.  Therefore, plaintiff argues that the Court should draw an inference against defendants.  The Court finds this argument to be without merit.  The issue of discovery of the personnel files of these individuals was the subject of two prior motions by plaintiff.  In June 2006, plaintiff moved for an order compelling defendants to produce the personnel files of "similarly situated" employees.  In November 2006, Magistrate Judge Lowe

initially issued an Order holding the motion in abeyance pending the Court's *in camera* review of the subject personnel files.  Magistrate Judge Lowe issued an order directing defendants to produce personnel files of individuals who had violated the dress code policy.  Plaintiff objected to that limitation and requested that the court direct defendants to "turn over personnel files of any such person(s)" who had allegedly been "AWOL".  In February 2007, Magistrate Judge Lowe issued an Order denying plaintiff's request for reconsideration and stated, "I find that no other employees who might have had an "AWOL" issue could have had a "reasonably close resemblance of facts and circumstances" to plaintiff's situation.  Accordingly, the Court rejects plaintiff's attempt to reargue this issue and finds that plaintiff has failed to establish an inference of discrimination by establishing that she was similarly situated to the two unidentified individuals who allegedly received preferential treatment.

###     2.      Timing and Sequence of Events

Nevertheless, the Court finds that the sequence of events leading to plaintiff's termination raises an inference of discrimination on her termination claims.  Defendants alleges that plaintiff was terminated due to unexcused absences.  The first unexcused absence allegedly occurred on August 25, 2001.  It is undisputed that plaintiff initially received approval to be absent on August 25, 2001.  However, the record contains conflicting accounts regarding whether plaintiff was advised that her future leave was in jeopardy or that she was required to report to work on August 25, 2001, despite the prior approval.  The second unexcused absence allegedly occurred between August 27, 2001 and September 4, 2001.  Again, the record contains conflicting testimony with regard to whether plaintiff was directed or advised to report to work after she was placed on "administrative leave" on August 26, 2001.

33

Consequently, based upon the sequence of events, plaintiff has met her *de minimis* burden of establishing the inference of discrimination as a motive for her termination.  Accordingly, a resolution of the conduct and circumstances surrounding plaintiff's dismissal are properly left to the trier of fact.  *See Chambers*, 43 F.3d at 40.  The burden shifts to defendants to articulate a non-discriminatory reason for their employment decisions.

### D.   Defendants' Proof of Legitimate, Non-discriminatory Reasons

Defendants burden of production is not a demanding one; it need only offer an explanation for the employment decision.  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. at 507, 509 (1993).  The burden is merely "one of production, not persuasion; it can involve no credibility assessment".  *Augustin v. Yale Club of New York City*, 2006 WL 2690289, at *23 (S.D.N.Y. 2006) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)).  The defendant's explanation of its legitimate reasons must be clear and reasonably specific.  *Murphy v. Middletown Enlarged City Sch. Dist.*, 525 F.Supp. 678, 691 (D.C.N.Y. 1981).  Moreover, defendants, "retain[] the incentive to persuade the trier of fact that the employment decision was lawful."  *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981))

With regard to the disciplinary actions taken against plaintiff for her violations of the directive, defendants contend that, "[p]laintiff's violation was handled as a routine course of business as opposed to having formal disciplinary measures taken against her".  Despite arguing in conclusory fashion that plaintiff was actually treated more favorably than Officer Robinson, defendants' motion papers are completely devoid of any explanation for the disparate discipline.  Moreover, although Commissioner Cowin contends that the directive was issued for safety and

security purposes, the directive does not contain such language.  Accordingly, defendants have failed to sustain their burden under the *McDonnell Douglas* analysis.

With regard to plaintiff's termination, defendants argue that plaintiff was not terminated for violating the directive, but rather, for being AWOL and that plaintiff's unexcused absences constitute legitimate, nondiscriminatory reasons for her termination.  Defendants contend that there were two instances of unexcused absences ("AWOL"): August 25, 2001 and August 27, 2001 through September 4, 2001.  Notwithstanding conflicting evidence in the record, defendants have established a legitimate, nondiscriminatory reason for plaintiff's termination.  *See Molokwu v. City of New York*, 2000 WL 1056314, at *2 (S.D.N.Y. 2000) (finding that excessive absences indicate a legitimate, nondiscriminatory reason for termination); *see also Brown v. The Pension Bds., United Church of Christ*, 488 F.Supp.2d 395, 403 (S.D.N.Y.2007) (holding that job abandonment was a legitimate, non-discriminatory cause for termination after plaintiff was AWOL for two days in a row and failed to call to justify the absence).  Under *McDonnell Douglas*, the burden is thus shifted to plaintiff who must now show that the reasons proffered by defendants for plaintiff's termination are a mere pretext for unlawful discrimination.

### E.      Plaintiff's Ultimate Burden

"[A] reason cannot be proved to be a 'pretext for discrimination unless it is shown **both** that the reason was false **and** that discrimination was the real reason."  *Fisher v. Vassar Coll.*, 114 F.3d 1332, 1339 (2d Cir. 1997) (en banc), *cert. denied,* 522 U.S. 1075 (1998) (emphasis in original).  Because the ultimate burden of persuasion always lies with the plaintiff, once the defendant has rebutted the plaintiff's *prima facie* case, the plaintiff must prove that it is more likely than not that impermissible discrimination was a motivating factor in the adverse

employment decision or, in the context of defeating a motion for summary judgment, that a rational finder of fact could infer such a conclusion from the admissible evidence. *Rouse v. City of New York*, 2009 WL 1532054, at *8 (S.D.N.Y. 2009) (citing *Bickerstaff*, 196 F.3d at 446).  All that is necessary to permit a case to proceed is evidence sufficient to raise an issue of fact as to whether a defendants' proffered reason for a plaintiff's termination was a pretext for discrimination. *See Tout v. County of Erie*, 2 F.Supp.2d 320, 326 (W.D.N.Y. 1998) (denying summary judgment where the plaintiff argued that her absences were legitimate and documented and that the defendants subjected her to discipline to get rid of her).

### 1.      Disparate Treatment

Even assuming defendants had offered a legitimate, non-discriminatory reason for the apparent difference in the manner plaintiff and Officer Robinson were disciplined, plaintiff has submitted sufficient evidence that a discriminatory reason was the motivation behind the discipline.  In disparate treatment cases, to establish pretext, relevant evidence includes defendants' general policy and practice with respect to minority employment. *See McDonnell Douglas*, 411 U.S. at 805 (holding that statistics as to [defendant's] employment policy and practice may be helpful to a determination of whether [defendant's actions] in this case conformed to a general pattern of discrimination against blacks.").  Evidence relating to company-wide practices may reveal patterns of discrimination against a group of employees, increasing the likelihood that an employer's offered explanation for an employment decision regarding a particular individual masks a discriminatory motive.  *Jhirad v. TD Secs. USA, Inc*., 2003 WL 1872654, at *3 (S.D.N.Y. 2003).  Because employers rarely leave a paper trail-or "smoking gun"-attesting to a discriminatory intent, disparate treatment plaintiffs often must build their cases

from pieces of circumstantial evidence. *Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85 (2d Cir. 1990) (internal citations omitted).  Such determinations are, generally speaking, most competently and appropriately made by the trier of fact so long as the plaintiff can present "solid circumstantial evidence" supporting her case, she should have the opportunity to prove her case at trial.  *See id.* (internal citations omitted).

In this case, plaintiff alleges that African Americans are not afforded the same promotional opportunities or executive positions as White officers and cites to the absence of African Americans on the DOC executive staff and the fact that no African Americans are part of any committees which require selection by Commissioner Cowin.[31]  In support of these allegations, plaintiff has provided an affidavit from Sgt. Washington.  Sgt. Washington provided testimony with regard to defendants' alleged pattern of discrimination against African Americans. Sgt. Washington averred that the DOC failed to promote her on six separate occasions and instead, promoted white males.  Plaintiff also relies upon the unexplained disparate disciplinary action taken against her and Officer Robinson for similar violations of the directive.  Taken collectively, the evidence raises a triable issue of fact as to whether defendants' reasons for disciplining plaintiff were pretextual.

### 2.      Termination

Plaintiff argues that she was terminated in retaliation for filing a complaint.  Defendants claim plaintiff was terminated for being AWOL on August 25, 2001 and AWOL for more than eight days from August 27, 2001 until September 4, 2001.

---

[31]  Plaintiff also makes allegations regarding the lack of African American female lieutenants and the fact that Sgt. Washington is the only African American female sergeant at the Facility.  However, as the Court previously noted, plaintiff's Title VII claims are untimely and plaintiff may not pursue a claim for gender discrimination based upon 42 U.S.C. § 1981.

### a.    August 25, 2001

Based upon the record, there are genuine issues of fact with regard to whether or not plaintiff was AWOL on August 25, 2001.  Defendants claim that on August 22, 2001, prior to leaving the Facility as directed by Lt. LeFebvre, plaintiff was told to report to work on August 25, 2001.  Defendants further contend that Lt. Conboy left a message on plaintiff's answering machine at her home directing plaintiff to report to work on August 25, 2001.  In contrast, plaintiff claims that she was never advised, upon leaving on August 22, 2001 or at any subsequent time, that she needed to report to work on August 25, 2001.

In the absence of testimony or an affidavit from Lt. Conboy, the DOC employee who allegedly made the calls, or telephone records demonstrating that the calls were made, defendants' allegations that "calls were made" is completely lacking in evidentiary support.

### b.    August 27, 2001 - September 4, 2001

It is undisputed that plaintiff never returned to the Facility after August 26, 2001.  Defendants contend that while plaintiff was being escorted from the Facility on August 26, 2001, she was advised by Lt. Burghardt to call Capt. Tripoli on August 27, 2001.   Plaintiff contends that Lt. Burghardt never advised her that she needed to call Capt. Tripoli the next day.  Plaintiff further claims that she never received any telephone messages or written correspondence from anyone at the Facility after she was escorted out of the building on August 26, 2001, advising her she was required to report to work.

Again, the Court finds that the conflicting accounts present a genuine issue of fact with regard to whether or not plaintiff was AWOL from August 27, 2001 until September 4, 2001.  Plaintiff and Lt. Burghardt disagree on what transpired in Lt. Burghardt's office on August 26,

38

2001 and the record lacks any testimony from Sgt. Griffin.  Further, as previously discussed, the record lacks any direct evidence from any DOC employee attesting to efforts made to contact plaintiff via telephone.  Moreover, the DOC's own witnesses provided incompatible testimony with regard to the events that transpired from August 21, 2001 until plaintiff was terminated.

Viewing the evidence in a light most favorable to plaintiff, a reasonable factfinder could conclude that defendants' proffered reasons for disciplining and terminating plaintiff were pretextual.

## VI.     Hostile Work Environment Under Section 1981 and NYSHRL

Plaintiff alleges that she was subjected to a hostile work environment based upon her race. To succeed on a claim for hostile work environment, plaintiff must establish: "(1) that her workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment; and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer.  *Van Zant*, 80 F.3d at 715.  The standard for establishing a hostile work environment is high, *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003), and a claim cannot be based upon vague, unsupported allegations. *Thomas v. Bergdorff Goodman, Inc.*, 2004 WL 2979960, at *7 (S.D.N.Y. 2004).

Plaintiff must prove both objective and subjective elements, i.e., that the conduct alleged is so severe and pervasive as to create an environment that "would reasonably be perceived, and is perceived, as hostile or abusive".  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993).  The Supreme Court has held that a work environment's hostility should be assessed based on the "totality of the circumstances".  *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (citing *Harris*, 510 U.S. at 23).  Factors to consider in assessing the totality of the circumstances include: (1) the

frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance.  *Id*.

A plaintiff may rely, in part, on instances of hostility which were not directed at her and, in some circumstances, on incidents occurring when she was not present.  *Smith v. New Venture Gear, Inc*., 2008 WL 200015, at *21 (N.D.N.Y. 2008); *see also Schwapp*, 118 F.3d at 111 (holding that second-hand knowledge of racially derogatory comments or jokes by a fellow employee or supervisor can impact the work environment).  However, a plaintiff may not rely on unsubstantiated rumor and hearsay to resist summary judgment.  *Id*.  A plaintiff who relies upon harassment that did not occur in plaintiff's immediate vicinity must establish that she "shared the same 'environment' - broadly conceived - as the person allegedly harassed" and that her own employment was adversely affected by the harassment.  *Leibovitz v. New York City Transit Auth*., 252 F.3d 179, 189 (2d Cir. 2001).

In this case, plaintiff alleges that a number of incidents created a hostile work environment including: (1) a racially offensive joke, flyer and derogatory name calling; (2) the fact that there were no African Americans on the DOC Executive Staff or committees; (3) Black History celebrations were sabotaged by white officers; (4) the DOC abandoned diversity training; and (5) Commissioner Cowin's failure to investigate the concerns of African American Correction Officers as memorialized in a letter from Correction Officer Maxine Adams.

### A.      Racially offensive joke, flyer, comments and slurs

"[M]ere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII."  *Harris*, 510 U.S. at

21.  Accordingly, "[f]or racist comments, slurs and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (holding that there must be a steady barrage of opprobrious racial comments).  Thus, whether racial slurs constitute a hostile work environment typically depends upon "the quantity, frequency, and severity" of those slurs, considered "cumulatively in order to obtain a realistic view of the work environment."  *Schwapp*, 118 F.3d at 110 -111 (internal citation omitted).

The Second Circuit recognizes that remarks made outside a plaintiff's presence and harassment directed at co-workers can be relevant to a hostile work environment claim.  *Leibovitz*, 252 F.3d at 190.  However, a plaintiff can only rely on such evidence to show how the alleged harassment contributed to her own working environment being hostile.  *Fox v. National R.R. Passenger Corp.*, 2009 WL 425806, at * 6 (N.D.N.Y. 2009) (holding that the events did not affect the plaintiff's working environment as he was not an active employee when the incidents occurred and did not witness the statements to co-workers) (citing *Leibovitz*, 242 F.3d at 190).

In this case, the record contains evidence of one racially offensive joke that was told in the staff dining room of the Facility in 1999.  Plaintiff conceded that she was not present when the offensive joke was told.  Moreover, the record establishes that plaintiff never personally complained to any officer or supervisor about the joke.  Plaintiff also alleges that Caucasian officers used racially offensive slurs including the word "nigger".  However, plaintiff cannot identify any co-workers allegedly involved and could not recall whether or not the word was ever used in her presence.  Further, plaintiff has failed to submit any proof establishing how her own work environment was impacted by statements that she did not hear.

41

Plaintiff also alleges that a co-worker, Officer Benjamin, loudly proclaimed that he was "allergic to Black" and told Sgt. Washington to "kiss his ass". However, plaintiff has no first-hand knowledge of such statements and did not provide any specifics regarding where they occurred. Moreover, the comments were allegedly made in December 2001, nearly three months after plaintiff was terminated. *See Lee v. Healthfirst, Inc*., 2007 WL 634445, at *22 (S.D.N.Y. 2007) (citing *Whidbee v. Garzarelli Food Specialties, Inc*., 223 F.3d 62, 71 (2d Cir. 2000) (incidents of harassment are relevant until the employee "actually leaves"). Consequently, plaintiff has failed to demonstrate how her own working environment was hostile based upon statements that she did not hear and that occurred after she was terminated.

Plaintiff alleges that she was offended by a flyer that was posted and circulated in the Facility by Officer Brush in 2000. Plaintiff alleges in her affidavit that, "I was deeply offended by the racially derogatory flyer" but admitted that she did not personally make any complaints about the flyer. Plaintiff described the flyer as "a black stick figure of a hangman".[32] Despite plaintiff's subjective perception and conclusory assertions, plaintiff offers no other evidence that the flyer was a racially derogatory depiction so humiliating to rise to the level of pervasive discrimination. The flyer is printed in black and white and makes no reference to race. Consequently, based upon the record, the Court cannot discern any racial context. *See Forts v. City of New York Dep't of Corr*., 2003 WL 21279439, at*6 (S.D.N.Y. 2003) (holding that there was no objective indication that a poster advertising a sex store that was found in areas where both men and women work was an objective indication of anti-female bias despite the plaintiff's claim that the poster was a sexually discriminatory incident).

---

[32] Plaintiff testified that, "[t]he picture depicted like it was the same type of picture that you draw for the hangman, but it was all black".

Even if the Court assumes that the flyer contains racial overtures, the record contains no evidence suggesting that this amounted to anything more than an isolated incident over the course of plaintiff's five year period of employment.  Indeed, courts in this Circuit have found that isolated incidents involving pictures which were far more racially offensive failed to establish a racially hostile work environment.  *See McCoy v. City of New York*, 131 F.Supp.2d 363, (E.D.N.Y. 2001) (holding that two incidents including a display of a noose and a racially offensive advertisement of an African American man with exaggerated features were racially hostile but insufficient to permit a trier of fact to conclude that they pervaded the plaintiff's work environment); *see also Pellei v. Int'l Planned Parenthood Fed./W. Hemisphere Region, Inc.*, 1999 WL 787753, at *11 (S.D.N.Y. 1999) (holding that posters of "destitute, half-dressed Latin Americans in combination with a memorandum that identified Latin-American females as "poor and powerless", did not rise to the level of severe and pervasive discrimination).

Consequently, plaintiff has not established that this conduct was severe or pervasive enough to allow a reasonable juror to conclude that the flyer, create an objectively hostile environment.  *Petrosino v. Bell Atlantic*, 385 F.3d 210, 221 (2d Cir. 2004).

**B.    Opportunities for Promotion**

Plaintiff alleges that African Americans were denied promotional opportunities thus creating a hostile work environment.  Plaintiff presents nothing more than conclusory allegations to support her assertions.  Plaintiff relies upon Sgt. Washington's claims that the DOC failed to promote her on several occasions, however, plaintiff  fails to establish how Sgt. Washington's lack of promotional opportunities impacted plaintiff's working environment.  Moreover, the failure to promote, without more, may not stand as grounds for a hostile work environment.  *See*

*Trezza v. Hartford, Inc*., 1998 WL 912101, at *4 (S.D.N.Y. 1998) (the failure to promote plaintiff is not a factor relating to workplace "environment").  With regard to plaintiff's personal promotional opportunities, the idea that plaintiff's environment was objectively hostile is undermined by the fact that the position of Correction Counselor I was filled by an African American woman.  *See Van Dunk v. St. Lawrence*, 604 F.Supp.2d 654, 664 (S.D.N.Y. 2009).

### C.    Sabotage of Black History Celebrations and Abandonment of Diversity Training

Plaintiff claims that in the 1990s, white officers "sabotaged" Black History celebrations by defacing flyers.  Plaintiff also claims that in 1993, Sgt. Washington wrote a letter to the Commissioner alleging that such conduct was an example of a hostile work environment. Plaintiff alleges that as a result of Sgt. Washington's complaints, the DOC banished the Black Awareness Month Committee and abandoned diversity training because white officers did not like the subject matter.

These alleged instances of harassment occurred in the "1990s", years prior to plaintiff's employment with the DOC.  Plaintiff has not established that based upon these instances, that her own working environment was hostile.  Plaintiff was not the target of the alleged harassment, was not present when it allegedly occurred and did not know of the harassment while it was ongoing. *See Leibovitz*, 252 F.3d at 190 (holding that the plaintiff failed to present evidence that her own working environment was hostile or prove that harassment of other women adversely affected the terms and conditions of her own employment ).  Therefore, plaintiff has failed to establish this alleged conduct created a hostile work environment.

### D.    DOC Failure to Investigate Complaints of Black Officers

Plaintiff alleges that the DOC's failure to investigate the complaints of African American officers after the April 4, 2002 meeting contributed to the hostile work environment.  Plaintiff's claim is without merit.  The issues addressed at the meeting and Commissioner Cowin's response, or lack thereof, are completely irrelevant for the purposes of this motion.  Plaintiff cannot demonstrate a hostile work environment based upon these events as plaintiff was no longer working at the Facility when the meeting took place.

Based upon the record, no reasonable fact finder could conclude that plaintiff was subjected to intimidation that was so severe or pervasive that it altered the conditions of her employment and created an abusive working environment based upon her race.  Accordingly, defendants are entitled to summary judgment and dismissal of plaintiff's hostile work environment claims.

## VII.   Retaliation Under Section 1981 and NYSHRL

Plaintiff alleges that as a result of complaints to her superiors, individually and collectively with other African American officers, defendants retaliated against plaintiff by: (1) treating her in a racially hostile manner; (2) unjustly disciplining her; and (3) unjustly terminating her.[33]

In order to establish a *prima facie* case of retaliation, a plaintiff must present evidence that would permit a rational trier of fact to find that: (1) she engaged in protected participation or opposition; (2) the employer was aware of this activity; (3) the employer took adverse action against the plaintiff; and (4) a causal connection between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.  *Kessler v.*

---

[33] The Court has already determined that plaintiff did not suffer from a hostile working environment.

45

*Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 205-206 (2d Cir. 2006) (internal citations omitted).  Once a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment action. *See Treglia v. Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002).  If a defendant meets this burden, the plaintiff must point to evidence that would be sufficient to permit a rational fact finder to conclude that the employer's explanation is merely a pretext for impermissible retaliation.  *See id.*

## A.     *Prima Facie* Case

Defendant argues that plaintiff cannot establish the first, second and fourth prong of the test.[34]

### 1.     Protected Activity

With respect to the first prong, the term "protected activity" refers to action taken to protest or oppose statutorily prohibited discrimination. *Wimmer v. Suffolk County Police Dep't*, 176 F.3d 125, 134-35 (2d Cir.1999).  Informal as well as formal complaints constitute protected activity.  *See Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990).  Protected activities include "making complaints to management," and may be in the form of a simple "objection voiced to the employer".  *Rodriguez v. Beechmont Bus Serv., Inc.*, 173 F.Supp.2d 139, 149 (S.D.N.Y. 2001) (internal citations omitted).  "Neither this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity." *Patane v. Clark,* 508 F.3d 106, 115 (2d Cir. 2007).  All that is necessary for the complaint to constitute a "protected activity" is

---

[34] Defendants do not claim that plaintiff did not suffer from an adverse employment action.  *See Cody v. County of Nassau*, 577 F.Supp.2d 623, 644 (E.D.N.Y. 2008) (termination is an adverse employment action).

that the plaintiff demonstrate a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Holava-Brown v. Gen. Elec. Co.*, 1999 WL 642966, at *3 (2d Cir. 1999) (quoting *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988)) (internal quotation marks omitted).

In this matter, plaintiff claims she suffered from retaliatory acts after she "submitted a Tri-Form" requesting a harassment form to file a complaint. Plaintiff alleges that she asked Sgt. Washington for a harassment form on August 21, 2001 after Sgt. Washington provided plaintiff with a copy of the directive. However, plaintiff's allegations are unsupported by the record and contradicted by her own deposition testimony. There is no evidence in the record of plaintiff requesting a form or of a complaint being filed. In fact, during her deposition, plaintiff testified that she could not remember if Sgt. Washington gave her a harassment form, that she did not keep a copy and further, that she could not remember to whom she submitted the form. However, this does not end the Court's inquiry.

On a motion for summary judgment, the Court is compelled to search the entire record and to determine whether a rational jury could make findings of fact that support plaintiff's claim. *David v. Comtech PST Corp,* 2006 WL 2713936, at *12 (E.D.N.Y. 2006) (holding that although none of the plaintiff's explicit arguments sufficed to withstand summary judgment, the law does not require the Court to ignore the record if there is a reason to deny summary judgment). In this case, upon a review of the record, the Court finds an issue of fact as to whether or not plaintiff engaged in a protected activity that defendants were aware of. On August 26, 2001, upon plaintiff's return to the Facility, plaintiff prepared a report at the request of Lt. Burghardt. On the last page of the report, plaintiff wrote the following sentence: "I am requesting a copy of my

report and a harrassment [sic] form." It is undisputed that plaintiff prepared the report while in an office with Sgt. Burghardt. Sgt. Burghardt acknowledged receiving the report and testified that he reviewed it to make sure it "covered the issues". Capt. Tripoli confirmed that plaintiff submitted the subject report. Based thereupon, the Court finds that plaintiff has presented enough evidence to allow a reasonable factfinder to conclude that she engaged in protected activity of which, defendants were aware. *See Patane*, 508 F.3d at 116 (the plaintiff pled facts showing that the defendant was aware of her protected activity as she complained directly to the defendant's employee). Thus, plaintiff has established the first and second prong in support of a *prima facie* case.

### 2.      Causal Link[35]

With respect to the fourth prong, causation can be demonstrated "indirectly by showing that the protected activity was followed closely by discriminatory treatment, through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant". *De Cintio v. Westchester County Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987). Plaintiffs who resort solely to temporal proximity in proving causation must demonstrate the existence of a time frame that is "very close". *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001). There is no "bright line" to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship. *Id*.

In this case, plaintiff argues that both temporal proximity and circumstantial evidence support her claim. With regard to temporal proximity, plaintiff claims that she was fired, "just a

---

[35] Defendants do not address the fourth issue of plaintiff's obligation to demonstrate a cause link between the alleged protected activity and her termination.

month after submitting her Tri-Form".  The Court has determined that plaintiff engaged in a protected activity on August 26, 2001 - when plaintiff made a notation in her report that she would be filing a complaint.  Plaintiff was terminated less than one month later, on September 24, 2001.  The gap between plaintiff's protected activity and her termination is close enough in time to support an inference that defendants terminated plaintiff in retaliation for asking for a harassment form.  *See Constance v. Pepsi Bottling Co. of NY*, 2007 WL 2460688, at *35 (E.D.N.Y. 2007).  Viewing the evidence in a light most favorable to plaintiff, the Court finds that plaintiff has established a *prima facie* case of retaliation.

### B.    Defendants' Legitimate, Non-Retaliatory Reasons

As previously discussed, defendants claim that plaintiff was terminated because she was absent without leave.  As discussed *supra*, this explanation is sufficient to meet defendants' burden of articulating a legitimate, non-retaliatory reason for terminating the plaintiff.

### C.    Pretext

Plaintiff raises triable issues of fact regarding pretext and retaliatory motives for the disparate discipline and termination.  Plaintiff claims that she did not receive defendants' telephone messages and further, that she was not advised to return to the Facility.  As discussed *supra*, this evidence is sufficient to allow a reasonable factfinder to conclude that defendants' explanations are merely pretext for retaliation.  *See Eldaghar v. City of New York Dep't of Citywide Admin. Servs.*, 2008 WL 2971467, at *13 (S.D.N.Y. 2008) (holding that the plaintiff established pretext and retaliatory motivation as she claimed that she did not receive any warning letters or probationary reports).

49

The record presents genuine issues of fact with respect to the issue of retaliation as a reasonable jury could find that defendants' decisions to discipline and terminate plaintiff were motivated, at least in part, by retaliatory animus. *See Williams v. City of New York* , 2006 WL 2668211, at *22 (E.D.N.Y. 2006). Therefore, defendants' motion for summary judgment and dismissal of plaintiff's claim of retaliation is denied.

**VIII.   Intentional Infliction of Emotional Distress**

Defendants argue that plaintiff's claim for intentional infliction of emotional distress is barred by the applicable statute of limitations. Plaintiff does not respond to defendants' argument. An intentional infliction of emotional distress claim is subject to a one-year statute of limitations. *See* N.Y. CPLR § 215. In the case at hand, plaintiff did not commence the within action until August 25, 2004. Plaintiff concedes that she was terminated on September 24, 2001. The record does not contain any evidence, nor does plaintiff suggest, that the statute should be tolled for any reason. *See Manliguez v. Joseph* 226 F.Supp.2d 377, 386 (E.D.N.Y. 2002) (finding no evidence that the plaintiff suffered from an ongoing pattern of harassment which would allow the "continuing tort doctrine" to apply). Accordingly, as plaintiff filed the action nearly 3 years after plaintiff was terminated, the cause of action for intentional infliction of emotional distress is time-barred and dismissed.

**IX.   Punitive Damages**

Municipalities and municipal employees sued in their official capacities are not liable for punitive damages. *See Ivani Contracting Corp. v. City of N.Y.*, 103 F.3d 257, 262 (2d Cir. 1997). Thus, all claims for punitive damages against defendants are dismissed.

**CONCLUSION**

50

Accordingly, it is hereby

**ORDERED** that defendants' motion for dismissal (Dkt. No. 36) of plaintiff's Title VII claims as time barred by the applicable statute of limitations is GRANTED; and it is further

**ORDERED** that plaintiff's claims pursuant to 42 U.S.C. § 1981 based upon gender discrimination are dismissed for failure to state a cause of action; and it is further

**ORDERED** that defendants' motion for summary judgment and dismissal (Dkt. No. 36) of plaintiff's claims pursuant to NYSHRL and 42 U.S.C. § 1981 of racial discrimination based upon defendants' failure to promote is GRANTED; and it is further

**ORDERED** that defendants' motion for summary judgment and dismissal (Dkt. No. 36) of plaintiff's claims of hostile work environment pursuant to NYSHRL and 42 U.S.C. §1981 is GRANTED; and it is further

**ORDERED** that defendant's motion for summary judgment and dismissal (Dkt. No. 36) of plaintiff's  claims pursuant to NYSHRL and 42 U.S.C. § 1981 of racial discrimination based upon disparate discipline and termination is DENIED; and it is further

**ORDERED** that defendant's motion for summary judgment and dismissal (Dkt. No. 36) of plaintiff's claims pursuant to NYSHRL and 42 U.S.C. § 1981 for retaliation based upon disparate discipline and termination is DENIED; and it is further

**ORDERED** that defendants' motion for summary judgment and dismissal (Dkt. No. 36) of plaintiff's claim of intentional infliction of emotional distress is GRANTED; and it is further

**ORDERED** that defendants' motion for summary judgment and dismissal (Dkt. No. 36) of plaintiff's claim for punitive damages if GRANTED.

**IT IS SO ORDERED.**

Date:  September 29, 2009

_____
Norman A. Mordue
Chief United States District Court Judge